**Exhibit A**

**Complaint**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

AMAZON.COM, INC. and AMAZON
DATA SERVICES, INC.,

    Plaintiffs,

    v.

WDC HOLDINGS LLC dba NORTHSTAR
COMMERCIAL PARTNERS; BRIAN
WATSON; STERLING NCP FF, LLC;
MANASSAS NCP FF, LLC; NSIPI
ADMINISTRATIVE MANAGER; NOVA
WPC LLC; WHITE PEAKS CAPITAL LLC;
VILLANOVA TRUST; JOHN DOES 1-20,

    Defendants.

CASE NO. 1:20CV484  LO/T4B

**VERIFIED COMPLAINT AND
DEMAND FOR JURY TRIAL**

**FILED UNDER SEAL PURSUANT TO
LOCAL RULE 5**

### VERIFIED COMPLAINT

    Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. (collectively "Plaintiffs" or "Amazon"), hereby allege the following in support of this action for an *ex parte* temporary restraining order, preliminary injunction, and other legal and equitable remedies for harm caused and imminently threatened by Defendants' unlawful and inequitable conduct.

### PRELIMINARY STATEMENT

    1.    Amazon seeks immediate relief from a significant fraud and kickback scheme that Defendants devised to secure illicit personal financial gains from certain Amazon real property transactions in Virginia. The need for relief is urgent based on Defendants' response to their removal from all involvement with transactions related to Amazon and an FBI raid at the home of one of their leaders in early April. Following the recent raid and issuance of the termination notices severing Amazon's ties with Defendants, this leader made statements alerting his accomplices to the FBI's inquiries and misrepresenting conduct that Amazon is actively investigating in

connection with this action.  Shortly thereafter, he joined other Defendants in an April 15, 2020 letter challenging their removal from the relevant operating agreement and landlord-developer entities and threatening Amazon's vendor, IPI, with legal claims.  This and other ongoing conduct by Defendants poses an imminent risk of destruction of evidence, dissipation of assets, and interference with Amazon business relationships, all central to this dispute.

2.    On April 8, 2020, the Denver Post reported that the FBI had "seized" materials covered by "a search warrant" issued "in a grand jury investigation" into "fraud and misappropriation of funds" by Defendant Brian Watson, CEO of Defendant Northstar Commercial Partners and a former candidate for Colorado State Treasurer. Ex. 1.  The FBI's warrant was executed on the same day that Watson and the Northstar-related Defendants received notice that their roles related to developing several properties in the Dulles corridor were being terminated based on evidence of their misconduct in underlying real estate transactions for which Amazon approved hundreds of millions of dollars in development capital.  The evidence revealed that Defendants paid millions of dollars in kickbacks to obtain non-competitive contracts that Defendants used to obtain tens of millions of dollars in illicit gains from development projects at Virginia real estate sites Amazon leased or purchased since 2018.  Following the FBI raid this month, Defendant Watson had claimed that Northstar alone expected to make "over $60 million in the next few years" from the relevant "Amazon deals." Ex. 34.

3.    Defendants executed their illegal scheme by using a host of limited liability companies (LLCs) and contracts to conceal self-dealing and fraud involving at least ten project sites until confidential informants and internal investigations exposed Defendants' misconduct and facilitated the business terminations and FBI's search warrant executed this month.  As detailed below, the evidence of Defendants' misconduct is overwhelming.  And recent developments establish an urgent need for immediate relief to prevent Defendants from interfering with

PLAINTIFFS' VERIFIED COMPLAINT

Amazon's legal rights including in this proceeding, diverting assets including an upcoming multi-million dollar payment directly related to their unlawful acts, and interfering with Amazon's vendor relationships (as Defendants have recently threatened).

4.     The evening of the April 2 FBI raid at his home, Defendant Watson sent an email to a broad range of personal and business contacts describing the FBI's inquiries, misstating Northstar's conduct and financial position, and alerting several other Defendants to specific criminal inquiries. Statements from this email then appeared in April 7 and 8 Denver press coverage of the FBI raid. Exs. 1–2. Notably, Watson's email characterized as "thieves" two former Northstar employees who "flipped" an Amazon Virginia property for "approximately $20 million" in inflated profits. Exs. 2, 34. But Amazon learned in the course of its investigation of this transaction that in September 2019, Watson had apparently negotiated with these same individuals a payment of at least $5 million from their ill-gotten gains before executing confidentiality agreements with them to conceal their misconduct. Declaration of Lora E. MacDonald ("MacDonald Decl.") ¶ 9. In addition to being misleading, Watson's statements about these transactions disclosed FBI inquiries regarding Northstar's payments to Defendant Villanova Trust, a primary vehicle for Defendants' kickback scheme. Ex. 2, 34.

5.     The foregoing and other recent acts by Defendants threaten irreparable harm to Amazon's vendor relationships in Virginia and related sensitive, ongoing investigations of Defendants' misconduct. As detailed below, Amazon has uncovered incriminating conversations and files documenting payments to the Villanova and White Peaks defendants that Watson referenced in his April 2 email, which also described FBI inquiries during the raid at his home. And on April 15, Watson and Northstar sent a letter to IPI, the current 100% equity investor in the lease development projects at issue in this suit, challenging Defendants' removal from the

operating agreement and associated landlord-developer entities, and threatening the relationships with Amazon's business partners and vendors. Ex. 4.

6.    The gravity of the threat Defendants pose to Amazon's business relationships, as well as to evidence and assets central to this case, materially increased on April 16, 2020, when the Denver Post reported the "resignations of Northstar's chief operating officer, chief financial officer and a senior accountant." Ex. 3.  As a result of these resignations, Defendant Watson now has principal control of Northstar, which publicly reported "$1.3 billion in assets under ownership and management," Ex. 2, but is now beset by lawsuits, investor and business partner claims, and an FBI investigation based in this District.  Under these circumstances, there is a grave and imminent risk that Watson, Northstar, and other Defendants will seek to protect their interests by interfering with IPI and other vendor relationships, spoliating evidence, further alerting accomplices, and/or misappropriating assets.  The relief requested herein is necessary to address all of these harms.

## BACKGROUND AND SUMMARY OF RELIEF REQUESTED

7.    As relevant here, Amazon carefully selects and develops real estate locations that will underlie its various supply chain and other business operations, including data centers and warehouses. A large collection of these sites is in Northern Virginia, where Amazon has invested heavily in acquiring and developing new facilities on top of land that Amazon has either purchased or leased with the assistance of third party commercial real estate companies.

8.    Defendants are commercial real estate companies and professionals that include at least one investment firm (Northstar), various limited liability companies (defendants Sterling NCP FF LLC, Manassas NCP FF LLC, White Peaks Capital LLC, and NOVA WPC LLC), and a bank trust (Villanova Trust), that exploited relationships with former Amazon personnel to engage in illegal activity against Amazon for the purpose of illicit personal financial gain. Defendants'

PLAINTIFFS' VERIFIED COMPLAINT

unlawful enterprise targeted at least nine Virginia commercial real property leases that Defendants sourced for Amazon between February 27, 2018 and January 13, 2020 (the "Lease Transactions"), and at least one 2019 transaction in which Amazon directly purchased a Virginia property brokered by Defendants (the "White Peaks Purchase").

9.      In the Leased Transactions, a former Amazon Real Estate transaction manager ("TM") and his successor selected defendant Northstar as the commercial real estate developer for various large contracts on the transactions underlying at least nine Virginia commercial property leases. Defendant Northstar's CEO, Brian Watson, had a personal relationship with both former Amazon TMs, and executed a kickback agreement (titled as a "Independent Contractor Agreement") with one of their siblings that allowed Northstar to funnel kickback payments to a trust in Tennessee (defendant Villanova Trust) where the former Amazon TMs had withdrawal privileges. This scheme is described herein as the "Lease Transaction Enterprise."

10.     For the White Peaks Purchase, Defendants likewise exploited relationships with the same former Amazon TMs, former Northstar personnel, and two LLCs (defendant NOVA WPC LLC and its affiliate defendant White Peaks Capital LLC) to charge Amazon more than $17 million in unjustified purchase and assignment fees on the approximately $100 million Virginia White Peaks property. The Defendants' unlawful conduct regarding the White Peaks property is described herein as the "Direct Purchase Enterprise."

11.     Defendants' illegal activities were executed through concealed contracts and LLCs and escaped detection until a former Northstar employee reported them to an Amazon executive in December 2019. That informant described the scheme as involving apparent kickbacks in excess of $8,000,000, and likely in the tens of millions of dollars. Ex. 5. As detailed below, the informant's report prompted an internal investigation, and in February 2020, Amazon was provided additional corroboration of Defendants' scheme. *See infra* ¶¶ 49–53; MacDonald Decl.

¶¶ 4–9, 17, 29–31, 34. Amazon's ongoing investigation into the fraud against it revealed further evidence of Defendants' misconduct at several Virginia development projects.

12.     Amazon's internal investigation of the two former Amazon TMs involved with Defendants' transactions revealed a deleted file entitled "Villanova Trust Executed.pdf," which references the kickback agreement Defendants used to facilitate the Lease Transaction Enterprise. And Colorado audio recordings of former Northstar principals confirm both the Direct Purchase Enterprise and Defendant Watson's 2019 (apparently successful) request that these two former Northstar employees pay Watson a portion of the illicit proceeds from the White Peaks Purchase in exchange for non-disclosure agreements.

13.     The scale and complexity of Defendants' enterprise activities, which may involve individuals and entities currently named as Doe Defendants, underscores the need for pre-judgment relief, particularly given the resources and recent actions of Watson and Northstar.  On information and belief, Watson owns a private jet and multiple properties, and has control over a wide array of personal and Northstar assets that he is now in a position to dispose of without supervision from members of Northstar's recently-departed management team.  Various sources, including Watson himself, confirm that he and Northstar face a multitude of legal claims, and that they are contesting their removal from the operating agreement and developer-landlord entities for the Virginia sites at issue in this suit, which were transitioned to IPI (the landlord-developer entities' majority equity owner) following discovery of Defendants' misconduct.  Allowing Amazon's vendors to operate without interference from Watson is critical to Amazon and its goodwill and business relationships.  Accordingly, Plaintiffs respectfully request the temporary restraining order and preliminary injunction addressed in the Application filed with this complaint.

## PARTIES

14.    Plaintiff Amazon.com, Inc. is located at 410 Terry Avenue North, Seattle, WA, 98109, and through its subsidiaries employs more than 10,000 individuals (with plans for many more) and has tens of billions of dollars in investments and assets in the Commonwealth.

15.    Plaintiff Amazon Data Services, Inc., a subsidiary of Amazon.com, Inc., is a Delaware corporation located at 410 Terry Avenue North, Seattle, WA, 98109, and among other functions, is the operator of many large Amazon facilities in Virginia and other U.S. states.

16.    Defendant WDC Holdings LLC dba Northstar Commercial Partners ("Northstar") is a "privately held, full-service real estate investment and asset management company headquartered in Denver, Colorado, USA, specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States." Ex. 6. Northstar is located at 1999 N. Broadway, Suite 3500, Denver, CO 80202.

17.    Defendant Brian Watson is the Founder and Chief Executive Officer of defendant Northstar Commercial Partners. On information and belief, Watson resides at 1499 Blake Street Apt. 7A, Denver, CO 80202.

18.    Defendants Sterling NCP FF, LLC, Manassas NCP FF, LLC and NSIPI Administrative Manager are entities formed and controlled by Defendants Watson and Northstar for purposes of executing the Virginia site transactions at issue in this suit.

19.    Defendant Villanova Trust is a trust formed and existing in the State of Tennessee. On information and belief, Villanova Trust, which was previously located at 16 Compton Trace, Nashville, TN 37215, Ex. 7 is now located at 3924 Wallace Lane, Nashville, TN 37215. Villanova Trust received payments from Defendant Northstar related to the Lease Transaction and Direct Purchase deals while former Amazon TMs, on information and belief, had Villanova withdrawal privileges and were employed by Amazon. During the period in suit, these individuals served as

PLAINTIFFS' VERIFIED COMPLAINT

Amazon's two primary decision-makers for real estate site identification and selection in Virginia, including on the Lease Transaction and Direct Purchase deals with Defendants. One of these former Amazon TMs was terminated in 2019, and his successor was terminated by Amazon this spring.

20.    Defendants White Peaks Capital LLC and NOVA WPC LLC are Delaware limited liability companies that on information and belief are located at 11364 Mesa Verde Lane, Parker, CO 80138, potentially with subsequent or additional locations in Henderson, Nevada. Two former Northstar employees served, respectively as Managing Director and Manager of these LLCs, which were used to effectuate the White Peaks Purchase with Amazon.

21.    Doe Defendants 1-20 are individuals and/or entities responsible for some or all of the practices, acts, conduct, and occurrences alleged herein, either as actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other Defendants. Plaintiffs will propose amendments to this Complaint alleging the true names and capacities of the DOE Defendants, and the roles they played, once further information about their participation in Defendants' enterprise schemes is ascertained.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the case arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, and Article III, section 2, clause 1, of the U.S. Constitution, which extends federal judicial power to "all Cases, in Law and Equity, arising under this Constitution [or] the Laws of the United States," including the grant in Section 11 of the Judiciary Act of 1789 of original federal equity jurisdiction over cases involving more than $500 between a citizen of the state where suit was brought and a citizen of a different state.

PLAINTIFFS' VERIFIED COMPLAINT

23.     This Court independently has jurisdiction of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and arises out of a dispute between or among citizens of different states.

24.     The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they arise from, and constitute part of, the same case or controversy that gives rise to Plaintiffs' federal claims.

25.     This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's subject matter jurisdiction.

26.     Venue is proper in this district under 28 U.S.C. § 1391(b) because it is a district in which Plaintiff maintains headquarters and/or substantial business operations, is the district in which the affected properties are located, and is the district in which a substantial or significant number of the acts giving rise to the action occurred.

27.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(c) because Defendants are subject to personal jurisdiction here. Defendants created and maintain business affiliates to conduct transactions and manage property and development activities in Virginia, and engaged in related conduct that purposely availed them of the privilege of conducting business in Virginia. Ex. 8. Notably, they visited Virginia to view potential and actual Amazon real property sites as well as review and execute lease contracts, and utilized instrumentalities located in Virginia and the Eastern District of Virginia to carry out the acts of which Amazon complains. Defendants thereafter affirmatively directed actions at Virginia and the Eastern District of Virginia by making payments and maintaining business operations here to obtain illicit investment, management, and other benefits on several Virginia commercial development projects.

## FACTUAL ALLEGATIONS

**A.    Amazon Real Estate Investments in Northern Virginia**

28.    Amazon has obtained real estate in and around Dulles, Virginia through two customary real estate deal structures: (i) build-to-suit leasing transactions; and (ii) direct purchase transactions.

29.    In build-to-suit leasing transactions, Amazon identifies the type of location that would be suitable for an Amazon facility and partners with a commercial real estate developer that is willing to find, acquire, and develop the land for Amazon.  Typically the developer purchases the land and builds the basic shell of the facility (*i.e.*, the external structure), and Amazon then leases the land and shell from the developer for a period of years and designs, builds, and operates the inside of the facility to suit its relevant business needs.  The total lease payments to the landlord-developer are calculated to compensate the developer for:  (i) the cost of the land; (ii) the construction cost of the shell; (iii) a negotiated percentage yield on the cost of the land and shell; and (iv) the developer's operating expenses to act as landlord.

30.    Amazon and/or its affiliates also purchase land outright and subsequently build Amazon facilities on these sites.

31.    Amazon has a multi-step process for selecting suitable land for both lease and purchase transactions that relies on market and internal diligence by Amazon real estate transaction managers such as the two former Amazon TMs involved in the Virginia transactions with Defendants.  Following site diligence, an Amazon transaction manager assigned to a given potential transaction will present the site and financials for  approval based on evidence that the site meets relevant business needs and its price aligns with market norms.

PLAINTIFFS' VERIFIED COMPLAINT

**B.      Amazon Contacts with Defendant Northstar**

32.     Northstar served as a primary developer-landlord for the Virginia real estate transactions at issue in this action.  Amazon began its relationship with Northstar in or around September 2017, when Brian Watson, Northstar's CEO, exploited his personal connections to two former Amazon Real Estate TMs to submit a sham response to Amazon's Request for Proposal ("RFP") for Virginia real estate developments.

33.     From February 2018 through January 2020, Amazon executed leases for commercial facilities around Dulles, Virginia with at least four Northstar-affiliated limited liability companies who acted as landlord-developers for the properties:  Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC.

34.     Northstar's primary equity investor in connection with these Amazon Lease Transactions was IPI.  IPI manages a fund that makes real estate investments in technology and connectivity-related real assets.  IPI is not named as a defendant in this action, and is not known or suspected to have endorsed or engaged in any of the conduct at issue in this suit.  As detailed above and below, Amazon and IPI recently reformed contracts relevant to the sites affected by Defendants' misconduct, and IPI transferred all Northstar-related responsibilities to other partners.

35.     Amazon has approved more than $400 million in Capital Appropriation Requests (*i.e.*, spend requests) for Northstar-affiliated Lease Transactions since February 2018.  Ex. 9.

**C.      The Lease Transaction Enterprise**

36.     Defendants Watson and Northstar met at least once in mid-2017 with the two former Amazon TMs who facilitated Defendants' involvement in the Virginia development projects at issue in this suit.  Ex. 10.  On information and belief, Watson met with both individuals on Thursday, August 24, 2017 in Seattle, potentially over dinner.  *Id.*; Ex. 11.  Emails referencing this meeting indicate that they interacted on a first-name basis, and that Watson referred to one of the

Amazon TMs as "Brother." Ex. 10. Email records suggest that at or around the time of the Seattle meeting, the junior TM sent Watson a RFP soliciting terms on which Northstar could partner with Amazon to expand Amazon's build-to-suit facilities in Northern Virginia. Ex. 12.

37.     On information and belief, the RFP Watson received was not sent to other developers. *See* Ex. 12. On or around September 20, 2017, Northstar responded to the RFP. Ex. 13. Northstar's response contained several representations that induced Amazon to contract with Northstar on the Virginia Lease Transactions at issue here. First, the response assured Amazon of Northstar's "commitment, loyalty, integrity, and honesty" to its business partners, *id*. at 112, and detailed an investment structure accountable to Amazon and investors and insulated from other projects. Specifically, the response stated that each Northstar "investment is orchestrated through a single-purpose limited liability company or fund that Northstar creates and directs," *id*. at 107, and that "Watson[] functions as the managing partner" and shares in the "net profits of [each] investment through designated sharing ratios with the capital partners," *id*. at 109.

38.     Second, the Northstar RFP included a proposed lease agreement that contained various representations regarding the disclosure and activities of all "Professional Service Providers." Ex. 13 at 53. Like the lease agreements Amazon ultimately executed with Northstar, the proposed agreements warranted that the Northstar entities had made no brokerage or other fee payments. *See id*. at 17, 21, 88; Ex. 14 at 7, 207, 209; MacDonald Decl. ¶ 24.

39.     Third, the Northstar RFP response proposed the creation of specific Northstar-affiliated entities (the proposed predecessors of Defendant Sterling NCP FF, LLC) that would form a joint venture with IPI to execute Virginia Lease Transactions with Amazon and control the downstream LLCs that would serve as the landlord-developers at the Virginia lease sites. Ex. 13. This joint venture (NSIPI Data Center Venture, LLC), a now wholly-owned indirect subsidiary of IPI, is the entity that removed Northstar from the operating agreement and terminated all Northstar-

related involvement in the properties earlier this month in response to evidence of Defendants' fraud and rackeetering.

40.    ***NSIPI Data Center Venture, LLC and Sterling NCP FF, LLC.***  On information and belief, the two former Amazon TMs directed Amazon's acceptance of Northstar's September 2017 RFP response for the Virginia Lease Transactions.  Watson then created defendant Sterling NCP FF, LLC to hold a 14.28% stake in the IPI joint venture (NSIPI Data Center Venture, LLC) slated to manage the first two Leased Transactions with Amazon.  The remaining 85.72% ownership in the joint venture is vested in IPI NSIPI Data Center Holdings, LLC—an entity wholly owned by IPI.  Once formed, the joint venture created the four downstream LLCs—Dulles NCP LLC;[1] Quail Ridge NP, LLC;[2] Manassas NCP LLC;[3] and Dulles NCP II, LLC[4]—that Northstar/Sterling managed as the landlords for the leased sites.  Watson separately created and controlled (through two intermediary LLCs) a separate entity (NSIPI Administrative Manager, LLC) to handle this management role.  The following chart depicts the relationship that Defendants Watson and Northstar had with IPI NSIPI Data Center Holdings, LLC and the various LLC landlord-developers involved in the Lease Transactions:

[1] On or around January 17, 2018, Northstar and IPI, through NSIPI Data Center Venture, LLC, formed Dulles NCP, LLC in Delaware for the purpose of executing two lease agreements with Amazon for the first two Virginia sites at issue here. Ex. 15.  On or around February 27, 2018, Amazon executed the two lease agreements for these sites with Dulles NCP LLC.

[2] On or around April 6, 2018, Amazon executed lease agreements for four additional commercial sites with Quail Ridge NCP, LLC. Ex. 9.  Public records indicate that Quail Ridge NCP LLC was incorporated on January 17, 2018. Ex. 16 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[3] On or around November 1, 2018, Amazon executed lease agreements for two further sites with Manassas NCP, LLC. Ex. 9.  Public records indicate that Manassas NCP LLC was incorporated on May 16, 2018. Ex. 17 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[4] On or about January 13, 2020, Amazon executed a further lease agreement for another commercial site with Dulles NCP II. Ex. 9.  Public records indicate that Dulles NCP II, LLC was incorporated on June 6, 2018. Ex. 18.

PLAINTIFFS' VERIFIED COMPLAINT



41.    Since 2018, Amazon has executed the following nine Lease Transactions with Northstar-affiliated landlords, all of which were sourced by Defendants as part of their scheme:

| Lease # | Landlord Entity | Date Executed |
|---|---|---|
| 1 | Dulles NCP LLC | February 27, 2018 |
| 2 | Dulles NCP LLC | February 27, 2018 |
| 3 | Quail Ridge NCP, LLC | April 6, 2018 |
| 4 | Quail Ridge NCP, LLC | April 6, 2018 |
| 5 | Quail Ridge NCP, LLC | April 6, 2018 |
| 6 | Quail Ridge NCP, LLC | April 6, 2018 |
| 7 | Manassas NCP LLC | November 1, 2018 |
| 8 | Manassas NCP LLC | November 1, 2018 |
| 9 | Dulles NCP II | January 13, 2020 |

**D.    December 2019 Report from Confidential Informant 1**

42.    On or about December 2, 2019, an individual formerly affiliated with Defendant Northstar ("Informant 1") emailed an Amazon executive and asked whether Amazon "[w]ould . . . care to hear about a couple of [Amazon] employees who have taken kick backs in excess of $8,000,000 maybe as high as $50,000,000[?]" Ex. 5.

43.    During a series of phone calls with members of Amazon's legal compliance team in late 2019 and early 2020, Informant 1 claimed to have personal knowledge of Northstar's payment of millions of dollars in kickbacks on Defendants' real estate transactions with Amazon, and stated his belief that the scheme had been ongoing since January 2018.

44.    Informant 1 specifically alleged that Defendants Watson and Northstar agreed to pay a percentage of all revenue Northstar received on Amazon deals to Villanova Trust, which was created by a family member of one of the Amazon TMs that solicited and approved Northstar's 2017 RFP response. The payments from Northstar to Villanova Trust were made pursuant to a kickback agreement, titled as an "Independent Contractor Agreement," executed by Northstar's CEO Brian Watson and the Amazon TM's sibling. On information and belief, the former Amazon TMs involved with Northstar's Amazon development projects had withdrawal privileges from Villanova Trust, which was used to funnel kickbacks to those TMs and their relative(s). Informant 1 asserted that Defendant Brian Watson was directly involved in the formation of this scheme, including through execution of Northstar's referral/kickback agreement with Villanova Trust and its Trustee, whom Watson recently described as a "best friend[]" Ex. 34.

45.    Informant 1 provided Amazon with evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018, and estimated that total payments from Northstar to Villanova Trust could amount to $30-40 million through late 2019, and over $50 million over the life of the affected commercial leases.

46.    Informant 1 further disclosed that, in addition to Brian Watson, other Northstar personnel may have had knowledge and/or involvement in the kickback scheme.

47.    Informant 1 provided Amazon with several documents, including what appeared to be a partially redacted email string between defendant Watson and other Northstar employees, in which Watson requested a report on the total fees Northstar had paid to Villanova Trust. Informant

I also provided what he described as a draft of the agreement between Northstar and Villanova that facilitated Defendants' kickback scheme on the Lease Transactions.

48.     Informant 1 separately provided Amazon with information about fraud and kickbacks on the White Peaks Purchase, including that two former Northstar employees used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate that transaction through the same Amazon TMs that facilitated the Lease Transactions. These activities were memorialized in recorded conversations and payment records.

49.     Informant 1's report in December 2019 prompted an immediate and extensive internal investigation that uncovered additional evidence of Defendants' misconduct.

E.     **February 2020 Report from Confidential Informant 2**

50.     In February 2020, another confidential Northstar informant ("Informant 2") approached IPI NSIPI Data Center Holdings, LLC and disclosed information and documents substantially corroborating the facts supplied by Informant 1.

51.     Notably, Informant 2 had uncovered an executed version of the Villanova kickback agreement that Brian Watson signed on behalf of Northstar on January 8, 2018. Ex. 19.

52.     Informant 2 also discovered two wire receipts (dated June 7, 2019, and August 7, 2019) documenting payments from Northstar-affiliated entities to Villanova Trust related to some of the Virginia Leases part of this dispute. Each wire receipt lists the "Originator Name" as "W D C HOLDINGS LLC" (aka Northstar), the "Beneficiary Bank" as "First Tennessee Bank," and the "Beneficiary" as "Villanova Trust" at "16 Compton Trace Nashville, TN." *See* Exs. 7, 20. The June 7 wire for $150,000 references "Dulles Final Leasing Payment." *See* Ex. 20. And the August 7 wire for $321,028.44 references "Manassas Leasing Fee." *See* Ex. 7.

53.     Informant 2 further discovered a spreadsheet with a column titled "Referal [sic] - Villanova Owed" with four separate entries totaling $1,497,614.50. *See* Ex. 21. The first entry

lists $250,000 owed for a "Leasing Fee" associated with the "Dulles" "Project." *Id.* The second entry lists $225,642.60 owed for a "Development Fee (20%)" also associated with the "Dulles" "Project." *Id.* The third entry reflects $760,210.50 owed for a "Leasing Fee (25%)" associated with the "Quail" "Project." *Id.* And the fourth entry reflects $211,761.40 owed for a "Development Fee (20%)" also associated with the "Quail" "Project." *Id.*

54.    After obtaining these documents, Informant 2 escalated the matter and shared the foregoing and other findings along with corroborating information and documents.

### F.    The Leased Transaction Enterprise

55.    The Leased Transaction Enterprise began with the Northstar RFP response for the two Virginia development projects detailed above, and grew into a broader scheme involving at least nine Virginia real property sites. Like the RFP response, the initial Lease agreements between Amazon and the Northstar-affiliated landlord LLCs warranted that: (i) there "are no management agreements, service, maintenance or *other contracts* . . . relating to the Project other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction,"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations." Ex. 14 at 7, 207, 209; MacDonald Decl. ¶ 24.[5]

56.    These statements were false when made, because at least a month before the initial lease agreements were signed in February 2018, Northstar (aka WDC Holdings, LLC) negotiated and executed the kickback ("Independent Contractor") agreement with Villanova's Trustee for "Business Development" services effective January 8, 2018. Exs. 19, 22. Notably, the appendix

---

[5] All emphasis herein is supplied unless otherwise noted.

to this agreement that was not disclosed to Amazon details a compensation schedule including "Development Fees," "MP Profits," "Brokerage Fees," and "Leasing Fees" for "Project Name Sterling NCP I, LLC," *id.*, the entity created to handle the first two Virginia Leased Transactions. *See* pp. 13–14 *supra* (org chart). The agreement itself is signed by Watson, *see* Ex. 19, and identifies Villanova Trust, through its Trustee (the brother of one of the former Amazon TMs that approved Northstar's RFP), as the "Contractor" entitled to the payments in the fee schedule, *id.*

57.    The "Sterling NCP I, LLC" reference in the kickback agreement is the same entity referenced in Northstar's September 20, 2017 RFP response to Amazon, *see* Ex. 13, which designated Sterling I NCP, LLC as one of the two Northstar entities—the other Sterling II NCP, LLC, Ex. 13 at 6—that would execute the two initial Virginia Lease Transactions with Amazon. After Watson and Northstar signed the kickback agreement with Villanova Trust, the Lease Transaction Defendants set their sights on a far broader scheme. They formed the Sterling entities referenced above, *see* pp. 13–14 *supra*, as an umbrella for managing a series of downstream landlord LLCs on at least nine Lease Transaction sites in Virginia.

58.    In furtherance of this scheme, Northstar notified Amazon on January 17, 2018 that Northstar would form an entity called "Dulles NCP, LLC" to execute the two initial Lease Transactions referenced in Northstar's original RFP. *See* Ex. 15. Northstar then used its upstream Sterling entities to obtain roles on several additional lease sites.

59.    The Lease Transaction Enterprise is reflected in at least nine lease-related payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019. Exs. 7, 20–21, 23–24. Specifically, Northstar (through WDC Holdings dba defendant Northstar) made payments of at least $5.11 million between March 2018 and August 2019 to at least four separate landlord LLCs in connection with nine separate Amazon Lease Transactions: Sterling (Lease #1, 2), Quail Ridge (Lease #3, 4, 5, 6), Dulles (Lease #9), and Manassas (Lease #7, 8). The full scope of the fraud,

kickback, and other unlawful activities that tainted these (and potentially other) transactions is not yet known. On or about December 14, 2018, Brian Watson requested that a Northstar subordinate send him "the template referral agreement" and itemized referral fees for Northstar's "top 10 referral partners," including Villanova Trust. Ex. 25. The Northstar employee informed Watson that "V illanova [sic] Trust" had received "$50,000." *Id.* Watson then requested "the total amount of fees we have paid to Villanova, or ALL fees . . . . Leasing, sales, development, etc." *Id.* The Northstar employee responded that Northstar had paid $4,641,955.40 to Villanova. *Id.*

60.     Whether other entities or individuals covered by Northstar's "template referral agreement" or "top ten referral partners' had a role in the Lease Transaction Enterprise or other unlawful scheme is not yet clear. But records obtained from Informant 2 indicate that at a minimum, the Lease Transaction Enterprise involving the named Defendants continued after December 2018. In 2019, Northstar sent at least two wires to Villanova Trust with "transaction memo" references to two separate Northstar landlord LLCs (Dulles and Manassas) connected to the Lease Transaction Enterprise:

| DATE | AMOUNT | TRANSACTION MEMO |
|------|--------|------------------|
| June 7, 2019 | $150,000.00 | Dulles Final Leasing Payment |
| August 7, 2019 | $321,028.44 | Manassas Leasing Fee |

### G.     April 2020 Removal of Northstar Parties from Amazon Projects

61.     The foregoing and other evidence of the Lease Transaction Enterprise obtained earlier this year made clear that Northstar's continued involvement in the nine Virginia properties presented an imminent risk to the integrity and goodwill of Amazon's business relationships, as well as an opportunity for Defendants and those acting in concert with them to spoliate evidence and convert assets central to ongoing legal investigations. Accordingly, Amazon and IPI took prompt action to remove Defendants Watson, Northstar, Sterling, Manassas, and Administrative Manager from their roles in the Virginia Lease Transaction sites.

PLAINTIFFS' VERIFIED COMPLAINT

62.    On February 19, 2020, Amazon and IPI executed (through their respective agents) a Lease Continuity Agreement for reformation of the leases and management contracts at the affected Virginia Lease Transaction sites.  The Lease Continuity Agreement relied on IPI's exercise of its "majority interest" authority over the joint venture that controls the Landlord LLCs for the relevant properties ("Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC and Manassas NCP, LLC") to remove the Watson/Northstar-affiliated Sterling entities from both the venture and their involvement with the Landlord LLCs and the properties.

63.    In early April 2020, IPI timely executed its obligations under the Lease Continuity Agreement with Amazon by, among other things, terminating the Watson/Northstar-affiliated rights and interests in the Lease Transaction properties, transitioning vendor obligations, and demanding Defendants' return of books, records, and business information central to the integrity of Plaintiffs' legal and business interests.  Ex. 26.

64.    Specifically, on April 2, 2020, IPI sent a formal Termination Letter to Northstar and Watson notifying them of the Cause Event for their termination and IPI's Election of Remedies as controlling stakeholder in the joint venture parent of the four landlord-developer entities for the relevant Virginia lease sites.  This letter effected the immediate removal of Watson and several Northstar affiliates (NSIPI Administrative Manager, LLC, Sterling NCP FF, LLC, and Manassas NCP FF, LLC) from the joint venture and associated landlord-developer companies.  Ex. 27.

65.    IPI coupled its April 2, 2020 Termination Letter to Defendants Watson and Northstar with required notices to other affiliates and partners.  Ex. 26.  These April 2020 notices included:

  a.    Termination Notices by Dulles NCP LLC, Quail Ridge NCP LLC, Manassas NCP LLC, and Dulles NCP II LLC to Northstar Healthcare Development terminating their respective development agreements;

20                        PLAINTIFFS' VERIFIED COMPLAINT

b. Termination Notices by Dulles NCP LLC, Quail Ridge NCP LLC, Manassas NCP LLC, and Dulles NCP II LLC to Northstar Commercial Partners Management terminating their respective management agreements;

c. Written Consent of the Board of Managers of Dulles NCP LCC, Dulles NCP II LLC, Quail Ridge NCP LLC, and Manassas NCP LLC to remove all Northstar officers; and

d. Notices to Amazon of Change of Landlord by Dulles NCP LLC, Dulles NCP II LLC, Manassas NCP LLC, and Quail Ridge NCP LLC.

66.    These terminations removed Northstar-related persons and entities from the operating agreement and the subsidiary landlord-developer LLCs. In keeping with this important transition, IPI timely sent written notices of the foregoing terminations to a host of project lenders and other partners for the sites, including local county governments and business contacts for project development, project finance, tenancy, and miscellaneous project support services including insurance and site maintenance.

67.    All of these actions were critical to protecting Amazon goodwill and business relationships at the relevant properties.

**H.    The Direct Purchase Enterprise (White Peaks Purchase)**

68.    The Direct Purchase Enterprise was a discrete but legally and financially significant complement to the Lease Transaction Enterprise. In the summer of 2019, two former Northstar employees used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate Amazon's acquisition of land in Chantilly, Virginia for a new Amazon development. *See* Ex. 32. On information and belief, at the time of the transaction, two Northstar employees served, respectively, as "Managing Director" of both LLCs, and as "Manager" of White Peaks Capital.

69.    On information and belief, certain named and Doe Defendants originally proposed that Amazon lease the site from White Peaks Capital. When Amazon ultimately decided on a direct purchase of the site, these Defendants sought to preserve their stake in the deal by proposing that Amazon purchase the land from White Peaks (rather than directly from the site's then-owner)

on the basis that White Peaks had locked in a purchase price well below what the owner would demand from Amazon. On information and belief, these representations caused Amazon to purchase the land from White Peaks for a substantial premium.

70.    On or about July 30, 2019, defendant NOVA WPC LLC paid $98.67 million to purchase the White Peaks property from 41992 John Mosby Highway LLC, a Virginia limited liability company that had purchased the land for $20 million just 13 months earlier. Exs. 28–30.

71.    That same day (July 30, 2019), NOVA WPC LLC sold the property to Plaintiff Amazon Data Services for $116.4 million. Exs. 30, 32–33. Press coverage of the sale highlighted Defendant NOVA WPC LLC's same-day profit of nearly $18 million. Ex. 30.

72.    On September 27, 2019, approximately six weeks after the foregoing story in the Washington Business Journal, Brian Watson confronted his Northstar colleagues about the White Peaks Purchase. Ex. 31. Watson began by accusing the senior employee of engaging in a side deal with Northstar's "largest client" (Amazon), and characterized the price-gouging on the transaction as "federal FBI-type stuff." *Id.* But Watson never raised his concerns with Amazon, and instead pressed his colleague to "pay us [Northstar] the money [$17.73 million] immediately" because "[a]nything that comes from [Amazon deals] should be Northstar." *Id.* Watson's colleague replied that he was "[p]otentially" willing to pay Northstar the money, but suggested he and Watson discuss the matter with their mutual Amazon contact (one of the two former Amazon TMs who met with Watson in Seattle in August 2017) "over a drink." *Id.* The Northstar principal then alluded to misconduct on other Amazon-related transactions, stating that "what we did for Amazon—that's FBI . . . . You have two corporate real estate people for the largest tenant in the world that if you trace the money, it will get out of hand" because there is evidence that "we all know what we did." *Id.* He then reiterated that he, Watson, and their Amazon contact should try

to "work something out" before someone "say[s] something to the wrong person and it gets out
. . . [and] the whole Amazon thing shuts down." *Id.*

73.    During Watson's separate conversation with the other Northstar employee involved
in the White Peaks Purchase, the employee said Northstar was left out of the deal because of
Watson's "actions and [his] treatment of [his colleague's] contract." Ex. 31.

74.    Following these conversations, Northstar did *not* immediately "fire[]" the two
employees involved in the White Peaks transaction as Watson asserted earlier this month. Exs. 2,
34.    Rather, on information and belief, they separated from Northstar only after executing
confidential agreements with Watson/Northstar and paying one or both of these Defendants a total
of approximately $5 million of their illicit profit on the White Peaks transaction with Amazon.
MacDonald Decl. ¶ 9.

I.    **Defendants' Ongoing Misconduct and Recent Threats of Irreparable Harm**

75.    Defendants' enterprise misconduct is ongoing, and poses an imminent threat of
irreparable harm to Amazon business relationships and goodwill at the affected sites.

a.    **Brian Watson and Northstar Commercial Partners**

76.    Hours after the FBI raided his home on April 2, 2020, Brian Watson sent a lengthy
and wide-ranging email to a broad range of personal and business contacts including the former
Amazon TMs and other Defendants who perpetrated the fraud against Amazon. In that email,
Watson alerted the group to the FBI's questions and documents (including and particularly the
grand jury's interest in Villanova Trust), cast blame on various former Northstar personnel,
referenced discussions with his legal counsel, and identified Northstar assets and payments that
could be affected by the fraud and misappropriation allegations against him. The email, like
Watson's April 2nd email statements, also made factual statements about Defendants' enterprise

activities that conflict with internal evidence including computer files, bank records, and voice recordings.

77.    Notably, Watson's April email stressed that Northstar's "$4,000 per month" agreement with Villanova Trust was executed with one of Watson's "best friends," for "research" and "introduc[tions]" to companies "who may have commercial real estate needs." It further stated that although Villanova's Trustee "introduced" Northstar to his brother at Amazon, Northstar won a "competitive" bid for the Amazon Virginia projects. Watson then stated that Northstar "paid [Villanova] a share of fees that were generated from [Northstar's] work with Amazon," but declared that "[t]he funds we sent were never sent to" the former Amazon TMs who oversaw the deals. Watson's April 2 email also referenced recent statements he made to "investors" that Amazon was "so pleased" with Northstar's work that Amazon "referred to [Northstar] as their best developer in the country." The conflict between the investigation record and Watson's recent statements confirms Defendants' misconduct and the imminent threat they pose to Amazon and public interests in this and related legal proceedings.

78.    As a threshold matter, the email statements Watson made on the evening of April 2 (and earlier that week to investors) about Amazon's view of Northstar's work flatly contradicts the termination notice for "fraud and willful misconduct" IPI issued to Northstar that same day.

79.    Further, the RFP response failed to disclose—and in fact expressly warranted the absence of—the preexisting relationship and agreement between Northstar and Villanova's Trustee that Watson described in his April 2 email. After stressing Northstar's "principles of commitment, loyalty, integrity, and honesty," Ex. 13 at 111, the RFP response emphasized that Northstar is "*completely transparent* throughout the process and calculation of Total Development Cost," *id.* at 149, and attached a draft Lease expressly stating that: (i) there "are *no* management agreements, service, maintenance or other contracts . . . relating to the Project other than those"

that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction," and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting, *or professional fees and costs* incurred in connection with lease negotiations," *id.* at 17, 21, 88; Ex. 14 at 7, 207, 209; MacDonald Decl. ¶ 24.

80.    Recently uncovered voice recordings, computer files, and financial records indicate that Defendants fraudulently induced and/or breached all of the foregoing representations, which were included in both Northstar's 2017 RFP and the final Virginia Lease agreements that Watson executed on behalf of Northstar and other Defendants. This evidence is particularly significant to the extent it connects payments to former Amazon TMs who had personal relationships with Villanova's Trustee and withdrawal authority from the Trust, but who Watson declared on April 2 did not receive any of the "funds" that Northstar "sent" to Villanova on the Virginia deals.

81.    Based on the information provided by the confidential informants, Amazon investigated the involvement of the former Amazon TMs. This examination revealed that one TM copied approximately 375 documents onto a USB device the night before he surrendered his company laptop for an IT scan, many of which referenced confidential Amazon business transactions, including on the Northstar Virginia sites. MacDonald Decl. ¶¶ 3–4. The Amazon IT inspection of the former TM's electronic files also uncovered a spreadsheet that appeared to be a rough calculation of the fees the TM was expecting on six different build-to-suit deals, including "Shaw Rd.", "Quail Ridge", "Manassas", "Lerner", "Route 50", and "DTC." *Id.* at ¶¶ 5, 48; Ex. 41. The referenced fees on these transactions, several of which concern Northstar-affiliated Lease Transaction sites, total $37.1 million, with the author's total "Share" indicated as $14.5 million. Ex. 41. The spreadsheet was recovered from the laptop's Recycle Bin, indicating an attempt to delete the file. *See* MacDonald Decl. ¶ 48.

PLAINTIFFS' VERIFIED COMPLAINT

82.    Amazon found other suspicious information in the former TM's files, including an Outlook back-end AppData folder containing a Northstar spreadsheet itemizing purported Northstar costs on the Amazon Manassas Leased Transaction deals. Ex. 37; MacDonald Decl. ¶ 6. On the lower right-hand side of the document, someone had calculated a "Leasing Fee" of $1,656,148, which approximates the $1.6 million Leasing "Commission" the TM had projected for the Manassas transactions. Ex. 37. This and other evidence contradicts Watson's recent assertions that the (undisclosed and/or prohibited) "fees" that Watson and Northstar paid Villanova Trust on the Virginia real estate transactions were "not sent" to Villanova beneficiaries who were employed by, or otherwise had legal obligations or duties of loyalty to, Amazon. It also corroborates that Northstar's engagements were not "competitive," but were instead facilitated by insiders in violation of Amazon's Code of Conduct. As relevant here, that Code requires Amazon personnel to, among other things:   (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly report" any potential "conflict of interest" such as "when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com." Ex. 36.

83.    Ongoing investigations into the Virginia Lease Transaction sites further suggest that Defendants' misconduct may extend beyond the specific Defendants and properties named herein, as evidenced by communications concerning an outstanding $1.2 million fee dispute between Northstar and its joint venture partner IPI. MacDonald Decl. ¶ 8. This dispute arose after Watson instructed Northstar's then-COO to direct an Amazon employee to add a $1.2 million fee in an amended lease with Amazon. *Id.* This request prompted that COO to contact an IPI employee, who told the COO he did not understand why Watson would charge such a fee, or why Amazon would approve it. *Id.* The COO then contacted Amazon directly about the fee, which Amazon rejected. *Id.*

84.     On information and belief, an employee who reported to Watson, who until earlier this month controlled all of the Landlord entities for the Virginia Lease Transaction sites, also signed various unauthorized change orders concerning construction and development work at the Amazon Virginia Lease Transaction sites.   And multiple Northstar employees who oversaw Watson's personal finances have corroborated apparent evidence that Watson commingled his own finances with Northstar assets.  MacDonald Decl. ¶ 9.

85.     The conversations Watson surreptitiously recorded with his former colleagues allude to similar Northstar involvement in misconduct involving the Virginia sites.  As noted, in those September 2019 conversations Watson made clear that his concern with the White Peaks Purchase was not that his then-employees—whom he now denounces as "thieves," Exs. 2, 34, cheated Amazon, but that they did not include Watson and Northstar in the ill-gotten gains on the deal, Ex. 31.  In the course of the recorded conversations, Watson agreed to "suspend[]" his former employees, *id.*, at least one of whom, on information and belief, subsequently deposited $5 million of the White Peaks proceeds in Watson's personal bank account coincident with executing confidential non-disclosure agreements with him, MacDonald Decl. ¶ 9.

86.     Watson's early April efforts to contradict the foregoing and other facts, potentially to signal accomplices to interfere with ongoing investigations, were followed by two more recent and equally concerning developments:  Northstar's April 15, 2020 challenge to its removal from the operating agreement and developer-landlord entities relevant to the Amazon Virginia sites, and the April 16 reports of the departure of most of Northstar's senior management team.  These events leave Watson with even more control of Northstar's challenge to IPI's business relationships with Amazon at the Amazon Virginia sites, and of Northstar/Sterling assets including past and future payments to accounts Watson maintains for the Sterling, Manassas, and Administrative Manager Defendants that were recently removed from the Amazon Virginia projects.  These payments,

including a multi-million dollar equity payout scheduled for this month, are detailed in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

### b.     Villanova Trust

87.     Villanova Trust's central and recently publicized role in the Lease Transaction Enterprise underscores the risk that Defendants or those acting in concert with them will spoliate or convert evidence or assets related to the Trust's role in Defendants' enterprise misconduct.

88.     On information and belief, the Trustee remains in a precarious financial position, and Watson's disclosure of Villanova as the subject of FBI inquiries may jeopardize Amazon's ability to prove and/or recover for the Trust's role in Defendants' scheme to extract tens of millions of dollars in improper payments on Amazon Virginia real estate transactions.

89.     To date, Amazon has kept its internal investigation of this scheme highly confidential due to its sensitive and ongoing nature, but Watson's recent statements regarding Villanova, and Northstar's April 15 challenge to IPI and other Amazon vendor relationships compel this suit and the relief that Amazon now seeks.

### c.     NOVA WPC LLC and White Peaks Capital LLC

90.     Finally, recent developments involving Watson's incrimination of his former Northstar employees as "thieves" responsible for the White Peaks Purchase, Exs. 2, 34, confirm Defendants' misconduct and the ongoing risk of harm to Amazon legal and business interests. As noted, recorded conversations and other evidence contradict Watson's statements that he simply "fired" these individuals, *id.*, and indicate that he received a $5 million payment from the proceeds that Defendants White Peaks Capital and NOVA WPC realized from the White Peaks deal, MacDonald Decl. ¶ 9.

91.    Information obtained from confidential informants earlier this year corroborates this evidence, MacDonald Decl. ¶ 9, and addresses unauthorized, Northstar-driven change orders and fee assessments at several Amazon Virginia Lease Transaction sites, *id.*

92.    Based on the foregoing allegations, Plaintiffs hereby plead the following causes of action and requests for relief.

## COUNT I
### Leased Transaction Enterprise in Violation of RICO, 18 U.S.C. § 1962(a), (b), (c), (d)

93.    Plaintiffs incorporate all preceding paragraphs by reference.

94.    This count is against Defendants Northstar, Sterling NCP FF LLC, Manassas NCP FF LLC, NSIPI Administrative Manager, Brian Watson, and Villanova Trust, and various Does (collectively the "Count I Defendants").

95.    Each Count I Defendant is a "person" as required by 18 U.S.C. § 1961(3).

96.    The Lease Transaction Enterprise, consisting of each named Count I Defendant, is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from the acquisitions, investments, and business activities of Amazon through perpetration of a kickback scheme in which the Count I Defendants fraudulently induced Amazon to send business and payments to Northstar that were then funneled through Villanova Trust (or other channels subject to the Count I Defendants' control) to distribute illicit gains from the Lease Transactions.

### Pattern of Racketeering Activity: Multiple Instances of Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343, 1346

97.    The Count I Defendants agreed to and did conduct and participate in the conduct of the Lease Transaction Enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding or otherwise harming Plaintiffs.

98.    The Count I Defendants conducted and participated, directly or indirectly, in the conduct, management, or operation of the Lease Transaction Enterprise's affairs through repeated

acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5). "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud). Anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of "the wires" "for the purpose of executing such scheme or artifice or attempting so to do" under 18 U.S.C. § 1343. "For purposes of this chapter, the term 'scheme or artifice to defraud' includes[, but is not limited to,] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

99. Pursuant to and in furtherance of their unlawful scheme, the Count I Defendants' Lease Transaction Enterprise committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud," and by "obtaining money . . . by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

100. These acts of wire fraud included at least nine wire payments between March 2018 and August 2019 that constituted kickback payments made pursuant to the referral/kickback agreement that Northstar, by and through its CEO and *alter ego* defendant Brian Watson, signed with Villanova Trust. These payments and related activities constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(c).

101. In all instances, the Count I Defendants acted with knowledge and fraudulent intent.

102. In committing these acts, the Count I Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

PLAINTIFFS' VERIFIED COMPLAINT

**Pattern of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956**

103.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

104.    Under 18 U.S.C. § 1956(a)(1)(A)-(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership. or the control of the proceeds of specified unlawful activity."

105.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)-(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."

106.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," the RICO statute.

107.    The Count I Defendants repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts at financial institutions to further their racketeering activities.  First, they regularly transacted business among themselves and others affiliated with their unlawful enterprises using the various LLC corporations, Northstar, and Villanova Trust.  For example, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in wired kickback payments from Northstar to Villanova Trust as of December

14, 2018. Informant 2 corroborated these payments and discovered two additional wire receipts (dated June 7, 2019 and August 7, 2019) documenting kickback payments from WDC Holdings (Northstar) to Villanova Trust in furtherance of the Lease Transaction Enterprise. These wire transfers occurred across state lines, as Northstar is located in Colorado and Villanova Trust and its accounts are located in Tennessee. Moreover, the Count I Defendants knew that the funds being transferred were derived from the unlawful activities of their Lease Transaction Enterprise and associated unlawful acts, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein. As such, the Count I Defendants violated 18 U.S.C. § 1956 every time they transacted using funds illicitly derived from the Lease Transactions and every time payments were made to Villanova Trust.

108. In addition, the Count I Defendants attempted to hide the origins and paths of the proceeds of their Lease Transaction Enterprise and related unlawful activities by passing funds derived from such activities through Villanova Trust, an entity created by the sibling of a former Amazon TM and friend of another, both of whom had legal and ethical duties to Amazon.

**Pattern of Racketeering Activity: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957**

109. Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.

110. One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

111. The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense"; it further defines "specified unlawful activity" as the

same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1).

112.   The money that the Count I Defendants derived through the kickback scheme and fraudulent dealings were taken at the expense, and to the detriment of, Amazon and its affiliates.

113.   Relatedly, through the Lease Transaction Enterprise and related unlawful kickbacks and other illicit activities, the Count I Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein (including wire fraud), which also constitute "specified unlawful activity" under 18 U.S.C. § 1957.   Through this conduct, the Count I Defendants derived proceeds.

114.   As the perpetrators and beneficiaries of the "specified unlawful activity" from which the funds were derived, the Count I Defendants knew the money was the product of such activity.

115.   By depositing these funds in at least one bank account held by an interstate financial institution, the Count I Defendants engaged in monetary transactions as defined by 18 U.S.C. § 1957(f)(1).   When the Count I Defendants engaged in any subsequent withdrawal, transfer, or exchange of these funds, they engaged in further monetary transactions as defined by 18 U.S.C. § 1957(1).

116.   As detailed above, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018.   And Informant 2 discovered two wires, one for $150,000 and another for $321,028.44, both far in excess of the $10,000 threshold required for liability under 18 U.S.C. § 1957.   On numerous occasions, the Count I Defendants withdrew or transferred portions of these proceeds in excess of $10,000.

117.   For the foregoing reasons, the Count I Defendants repeatedly violated 18 U.S.C. § 1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

PLAINTIFFS' VERIFIED COMPLAINT

**Pattern of Racketeering Activity: Violation of the Travel Act, 18 U.S.C. § 1952**

118.   Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of "interstate facilities" to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

119.   The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

120.   For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers.  The Count I Defendants made use of interstate facilities in furtherance of their crimes of money laundering.

121.   The Count I Defendants used wire transfers to make payments and on information and belief communicated to each other via phone and/or e-mail in order to further their money laundering activities. The Count I Defendants reside in various states and used interstate facilities in furtherance of their crimes of money laundering.  For example, multiple wire transfers from Northstar in Colorado went to Villanova Trust in Tennessee.  Northstar and other Defendants domiciled in Colorado, Tennessee and Nevada conducted business with Amazon, which has headquarters and/or principal places of business in Washington State and Virginia.  Any transactions that the Count I Defendants  made with vendors or other business partners located in Virginia were also interstate activities that furthered their bribery (kickback) and money laundering activities with respect to the Lease Transactions.

122.   Both to commit acts of bribery and money laundering and to facilitate these acts, the Count I Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful

PLAINTIFFS' VERIFIED COMPLAINT

activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity." Among other things, they intentionally engaged in acts of bribery (kickbacks) and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956. Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).

### Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity under 18 U.S.C. § 1961(5)

123.    The Count I Defendants committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering. The acts alleged were related to each other by virtue of common participants (the Count I Defendants), a common victim (Amazon), a common method of commission (perpetration of a kickback and money laundering scheme that fraudulently induced Amazon's business and contracting decisions to the benefit of the Count I Defendants), and a common purpose (defrauding and otherwise extracting unlawful payments from Amazon for the personal financial gain of the Count I Defendants while concealing their unlawful conduct). The Count I Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

124.    As a direct and proximate result of the Lease Transactions Enterprise and the Count I Defendants' racketeering and other activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principle . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

125.   As a direct and proximate result of the Lease Transaction Enterprise Defendants' racketeering activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

126.   The Count I Defendants derived, both directly and indirectly, financial and other benefits as a result of their unlawful Leased Transaction Enterprise, including but not limited to the kickbacks and other payments they received as a result of their fraud and other enterprise conduct.

127.   The unlawful proceeds from Defendants' Leased Transactions Enterprise were used in part to operate defendant Northstar, which defendant Brian Watson converted as a vehicle and *alter ego* for the unlawful activities of the Count I Defendants' racketeering activities.   On information and belief, Watson commingled his personal finances with Northstar funds and assets. Moreover, Watson is listed as the owner of the various Northstar-associated entities—notably Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, and NSIPI Administrative Manager, LLC—that until April 2, 2020 had ownership interests and/or management responsibilities for Lease Transaction properties through NSIPI Data Center Venture, LLC, the joint venture that (through IPI) recently terminated all Northstar-related interests in the venture.

128.   The Count I Defendants maintain control of the Lease Transaction Enterprise, including defendants Northstar and Villanova Trust, which entities engage in interstate commerce and whose activities affect interstate commerce.

129.   The Count I Defendants violated 18 U.S.C. § 1962(c) by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

130.    The Count I Defendants also violated 18 U.S.C. § 1962(d), which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c), because they knowingly agreed to commit, and subsequently engaged in, a pattern of racketeering activity.

131.    As a result of the Count I Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962, Amazon was injured in its business and property, within the meaning of 18 U.S.C. § 1964©.

132.    As a result of their misconduct, the Count I Defendants are liable to Amazon for Amazon's losses in an amount to be determined at trial.

133.    Pursuant to RICO, 18 U.S.C. § 1964(c), Amazon is entitled to recover treble damages, plus costs and attorneys' fees, from the Count I Defendants.

## COUNT II
### Direct Purchase Enterprise in Violation of RICO, 18 U.S.C. § 1962(a), (b), (c), (d)

134.    Plaintiffs incorporate all preceding paragraphs by reference.

135.    This count is against Defendants White Peaks Capital, NOVA PWC LLC, Northstar, Brian Watson, and various Does (collectively the "Count II Defendants").

136.    Each Count II Defendant is a "person" as required by 18 U.S.C. § 1961(3).

137.    The Direct Purchase Enterprise, consisting of each Count II Defendant, is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from acquisitions, investments, and business activities of Amazon through fraud and the perpetration of a kickback scheme in which business and payments were made to Defendants in connection with the White Peaks Purchase Transaction.

PLAINTIFFS' VERIFIED COMPLAINT

**Pattern of Racketeering Activity: Multiple Instances of Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343, 1346**

138.   The Count II Defendants agreed to and did conduct and participate in the conduct of the Direct Purchase Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

139.   The Count II Defendants conducted and participated, directly or indirectly, in the conduct, management, or operation of the Direct Purchase Enterprise's affairs through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

140.   "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud).  Anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of "the wires" "for the purpose of executing such scheme or artifice or attempting so to do" under 18 U.S.C. § 1343. "For purposes of this chapter, the term 'scheme or artifice to defraud' includes[, but is not limited to,] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

141.   Pursuant to and in furtherance of their unlawful activities, the Count II Defendants' Direct Purchase Enterprise committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud" and by "obtaining money . . . by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

PLAINTIFFS' VERIFIED COMPLAINT

142.    These racketeering acts include bank wire payments among the Count II Defendants to secure the sale and settlement of Plaintiffs' direct purchase of the White Peaks commercial real estate parcel in 2019. Specifically, the Count II Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation *by wire for placement in the qualified exchange escrow account*." Ex. 35. The Count II Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. *Id.* The Count II Defendants also directed or caused the payment of approximately $5 million in proceedings from the Direct Purchase Enterprise to a personal bank account registered to Count II Defendant Brian Watson in or around the fall of 2019.

143.    In all instances, the Count II Defendants acted with knowledge and fraudulent intent.

144.    In committing these acts, the Count II Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956**

145.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

146.    Under 18 U.S.C. § 1956(a)(1)(A)-(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

147.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)-(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift,

transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."

148.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)."

149.    The Count II Defendants engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts to further their racketeering activities. Specifically, the Count II Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account." Ex. 35. The Count II Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. *Id.* On information and belief, the Count II Defendants also directed or caused the payment of approximately $5 million in proceeds from the Direct Purchase Enterprise to a personal bank account registered to Count II Defendant Brian Watson in or around the fall of 2019. The Count II Defendants knew that the funds being moved to these accounts were derived from the unlawful activities of their enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein. As such, the Count II Defendants violated 18 U.S.C. § 1956.

150.    In addition, the Count II Defendants attempted to hide the origin and path of the proceeds of their unlawful activities, in violation of 18 U.S.C. § 1956(a).

PLAINTIFFS' VERIFIED COMPLAINT

**Pattern of Racketeering Activity: Engage in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957**

151.   Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.

152.   One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

153.   The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense;" it further defines "specified unlawful activity" as the same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1).

154.   On information and belief, the Count II Defendants directed or caused the payment of approximately $5 million in proceeds from the Direct Purchase Enterprise to a personal bank account registered to Count II Defendant Brian Watson in or around the fall of 2019.  This money was on information and belief the fruit of the Count II Defendants' unlawful activities related to their Direct Purchase Enterprise.

155.   The Count II Defendants thereby repeatedly violated 18 U.S.C. § 1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

**Pattern of Racketeering Activity: Violation of the Travel Act, 18 U.S.C. § 1952**

156.   Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of "interstate facilities" to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

PLAINTIFFS' VERIFIED COMPLAINT

157.   The Travel Act defines "unlawful activity" to include "extortion. bribery. or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

158.   For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers.  The Count II Defendants made use of interstate facilities in furtherance of their crimes of money laundering.

159.   The Count II Defendants used wire transfers to make payments and on information and belief communicated to each other via phone and e-mail in order to further their money laundering activities.

160.   Both to commit acts of bribery (kickbacks) and money laundering and to facilitate their acts of bribery and money laundering, the Count II Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity." They intentionally engaged in acts of bribery and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956. Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).

**Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity Under 18 U.S.C. § 1961(5)**

161.   The Count II Defendants each committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering.  The alleged acts were related to each other by virtue of common participants (the Count II Defendants), a common victim (Amazon), a common method of commission (fraud to induce Amazon to pay a premium on property acquisition), and a common purpose (defrauding Amazon in order to steal from Amazon and enrich the Count II Defendants at Amazon's expense while concealing their unlawful conduct).  The

Count II Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

162.  As a direct and proximate result of the Count II Defendants' racketeering activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principle . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

163.  As a direct and proximate result of the Count II Defendants' racketeering activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

164.  The Count II Defendants maintain control of the Direct Purchase Enterprise, including defendants White Peaks Capital and NOVA WPC LLC, which entities engage in interstate commerce and/or whose activities affect interstate commerce.

165.  The Count II Defendants violated 18 U.S.C. § 1962(c) by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

166.  The Count II Defendants also violated 18 U.S.C. § 1962(d), which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c), because they knowingly agreed to commit, and subsequently engaged in, a pattern of racketeering activity.

167.    As a result of the Count II Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962, Amazon was injured in its business and property, within the meaning of 18 U.S.C. § 1964(c).

168.    As a result of their misconduct, the Count II Defendants are liable to Amazon for Amazon's losses in an amount to be determined at trial.

169.    Pursuant to RICO, 18 U.S.C. § 1964(c), Amazon is entitled to recover treble damages, plus costs and attorneys' fees, from Count II Defendants.

## COUNT III
### Detinue Pursuant to Va. Code § 8.01-114

170.    Plaintiffs incorporate all preceding paragraphs by reference.

171.    Plaintiffs are entitled to recover the approximately $17 million they paid as a result of the Count II Defendants' fraudulent and other unlawful conduct inducing the White Peaks Purchase, along with any "referral fees," kickbacks, or other compensation the Count II Defendants obtained from Plaintiffs by or through the Direct Purchase Enterprise.

172.    Plaintiffs are also entitled to recover all funds they paid as a result of the Count I Defendants' fraudulent or other unlawful conduct inducing or breaching the Lease Transactions, including all payments the Count I Defendants funneled through Villanova Trust or otherwise by or through the Lease Transaction Enterprise.

173.    Pursuant to Va. Code § 8.01-534, Plaintiffs aver that the specific personal property sought to be levied or seized "[w]ill be sold, removed, secreted or otherwise disposed of by the defendant[s], in violation of an obligation to the plaintiff[s], so as not to be forthcoming to answer the final judgment of the court respecting the same."

## COUNT IV
### Fraud

174.    Plaintiffs incorporate all preceding paragraphs by reference.

PLAINTIFFS' VERIFIED COMPLAINT

175.   In Virginia, a party "alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993).

176.   Defendants made false representations because they represented and warranted to Amazon that:  (i) they did not pay or receive any undisclosed referral or other fees to third parties in relation to the Virginia Lease Transaction sites or White Peaks Purchase; and (ii) the Lease Transactions and White Peaks Purchase were competitive fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.

177.   The facts that Defendants misrepresented or omitted were material.  As noted, a central component of the Lease Transactions was the parties' agreement that "no" referral fees to third parties would be paid, and that employees responsible for ensuring the execution of those transactions would comply with all relevant laws and codes of conduct.  Amazon's execution of the White Peaks transaction was expressly premised on the understanding that the Company was paying a competitive market price in an arms-length transaction, not one unlawfully inflated by millions of dollars due to Defendants' fraud and kickback scheme.

178.  Defendants   knowingly   and   intentionally   made   the   above   and   other misrepresentations or omissions to Plaintiffs to induce them to enter into the Lease Transactions and White Peaks Purchase that Defendants knew involved prohibited and/or undisclosed payments.  The Count I Defendants knew at the time they covenanted not to pay third party referral fees that they would channel payments through Northstar's kickback ("Independent Contractor") agreement with Villanova Trust, which in turn resulted in payments to former Amazon TMs and others in violation of applicable laws and Amazon's Code of Conduct.  Count II Defendants

likewise intentionally sold the White Peaks property to Amazon at a price they knew was not the competitive market price represented to Amazon in accordance with its procurement standards.

179.    Defendants made these misrepresentations and omissions with the intent to mislead Amazon and fraudulently induce it to award them lease and purchase contracts (on all of the Virginia Leased Transaction properties and the White Peaks Purchase) so they could reap millions of dollars in unlawful fees and other payments.

180.    Plaintiffs relied on Defendants' misrepresentations and omissions to their detriment. Amazon entered into the Lease Transactions in reliance on Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best interests and in compliance with Amazon's Code of Conduct, and that the price Amazon paid for the Leases and the White Peaks Purchase were competitive market prices. The Defendants knew that Amazon would not have proceeded with the transactions had Amazon known of the payments channeled to Amazon employees and their relatives. As a direct result of Amazon's reliance on Defendants' material misrepresentations and omissions, Amazon sustained at least tens of millions of dollars in damages, including but not limited to the inflated purchase price on the White Peaks property and the costs and fees it paid to members of the Leased Transaction Enterprise on contracts they procured through fraud and kickbacks.

181.    Plaintiffs' reliance on Defendants' misrepresentations and/or omissions resulted in damages to Plaintiffs.

## COUNT V
### Tortious Interference with Contractual and/or Business Relations

182.    Plaintiffs incorporate all preceding paragraphs by reference.

183.    The elements of tortious interference are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part

of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).

184.   Plaintiffs entered into contractual relationships and/or business expectancies with Defendants, their affiliates, and other partners as alleged herein.

185.   Defendants had knowledge of these contracts, relationships, or business expectancies.

186.   Defendants acted intentionally to induce or cause a breach or termination of Plaintiffs' contractual relationships or business expectancies by, among other things, charging fees that were not authorized by Plaintiffs and/or were affirmatively prohibited by Plaintiffs' contracts and/or business policies and practices, and otherwise engaging in unlawful conduct that impeded or injured Plaintiffs' contractual or business relationships with non-defendant parties.

187.   Plaintiffs have been harmed by, and are suffering from ongoing and imminent threats of additional harm from, Defendants' tortious interference with Plaintiffs' contractual and/or business relations as detailed above and in the Application accompanying this complaint. Injury and damages include, but are not limited to:  irreparable harm to the business relationships at the affected Virginia real property sites; immediate economic damages resulting from inflated and fraudulent transaction costs and non-competitive bidding; damages associated with replacing Northstar and other Defendant-affiliated entities at the affected sites, which transition involved substantial business time, attorneys' fees, and site responsibilities; and damages caused by site disruption, development delays, and the associated loss of goodwill, and reputational harm. Although many of these harms are compensable in money damages, the injury to Amazon's ongoing business and business relationships is not, and regardless injunctive relief is necessary to

prevent the Defendants from spoliating evidence and assets essential to recovery of monetary relief.

## COUNT VI
### Civil Conspiracy

188.  Plaintiffs incorporate all preceding paragraphs by reference.

189.  In Virginia, a common law claim of civil conspiracy lies where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014). Virginia law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." Va. Code § 18.2-499(A).

190.  As alleged in Paragraphs 30 to 90 herein, Defendants have conspired to engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs.

191.  Under the statutory claim for civil conspiracy, Plaintiffs are entitled to "recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel." Va. Code § 18.2-500(A). Amazon is also entitled to "loss of profits." *Id.*

## COUNT VII
### Breach of Contract

192.  Plaintiffs incorporate all preceding paragraphs by reference.

193.  In Virginia, "the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation;

and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006).

194.    Plaintiffs and their affiliates executed contracts with Defendants stating, among other things, that Defendants did not have any third party broker, finder, or similar referral contracts or arrangements in relation to the Virginia Lease Transaction sites or White Peaks Purchase, and that the Lease Transactions and White Peaks Purchase were competitive, fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.  Notably, the Lease agreements between Amazon and the Northstar-affiliated landlord LLCs for the Virginia Lease Transaction sites warranted that:  (i) there "are no management agreements, service, maintenance or *other contracts* . . . relating to the Project other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction,"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting, or *professional fees and costs* incurred in connection with lease negotiations."  Ex. 14 at 7, 207. 209; MacDonald Decl. ¶ 24.

195.    The Count I Defendants knew at the time they induced Plaintiffs to sign contracts concerning the Lease Transaction sites and White Peaks Purchase that they had previously executed "referral" agreements as part of the kickback scheme and would in fact charge undisclosed and prohibited amounts to Amazon, including to inflated commissions, unauthorized site fees, and kickback payments they funneled through Villanova Trust.  Amazon has been damaged in amounts totaling at least $50 million as a result of Defendants' knowing breach of their contract provisions and warranties.

## COUNT VIII
### Unjust Enrichment

196.   Plaintiffs incorporate all preceding paragraphs by reference.

197.   In Virginia, a plaintiff may pursue a claim for unjust enrichment where he demonstrates that he (1) conferred a benefit on the defendant, (2) the defendant knew of the conferring benefit, and (3) the defendant accepted or retained the benefit under circumstances which render it inequitable for the defendant to do so without paying for its value. *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 631 (E.D. Va. 2010).

198.   Plaintiffs conferred a benefit on Defendants in the form of awarding business, contracts, and payments to Defendants that Defendants procured through fraud, unlawful and inequitable conduct, collusion, and racketeering activity.

199.   As alleged above, Defendants knew of the benefits that Plaintiffs conferred upon Defendants in the Lease Transaction Enterprise and Direct Purchase Enterprise.

200.   It is unjust that Defendants should retain the benefits of their unlawful activities.

## COUNT IX
### Conversion and Constructive Trust

201.   Plaintiffs incorporate all preceding paragraphs by reference.

202.   Under Virginia law, "conversion occurs where one uses another's personal property as his own and exercises dominion over it without the consent of the owner." *Nossen v. Hoy*, 750 F. Supp. 740, 743 (E.D. Va. 1990); *see also Bader v. Central Fidelity Bank*, 245 Va. 286, 287 (Va. 1993) ("Conversion is any wrongful exercise or assumption of authority, personally or by procurement, over another's goods."). "A conversion may be committed by intentionally . . . dispossessing another of a chattel," Restatement (Second) of Torts § 223 (1965), which can occur by intentionally "obtaining possession of a chattel from another by fraud or duress, *id.* § 221." *See also id.* § 221 cmt. B ("One who by fraudulent representations induces another to surrender the

possession of a chattel to him has dispossessed the other of the chattel [and] taking possession of the chattel given under such circumstances is ineffectual to constitute a consent to the taking.").

203.   Defendants and/or their affiliates intentionally obtained and exercised dominion and/or control over Plaintiffs' property through fraudulent and otherwise unlawful and inequitable individual and enterprise conduct.

204.   Defendants engaged in such conduct without Plaintiffs' consent, and as a result Plaintiffs are entitled to remedies for Defendants' conversion of Plaintiffs' property including but not limited to constructive trust over the accounts and assets identified in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

## COUNT X
### *Alter Ego*/Piercing the Corporate Veil

205.   Plaintiffs incorporate all preceding paragraphs by reference.

206.   In Virginia, a court may pierce the corporate veil upon a showing that "(1) the corporation was the *alter ego*, alias, stooge, or dummy of the other entity; and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime." *William v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014).

207.   With respect to the White Peaks Purchase, NOVA WPC LLC and White Peaks Capital LLC were *alter egos* of former Northstar personnel and Doe Defendants in executing the Direct Purchase Enterprise.  White Peaks Capital LLC was registered to the same address as a former Northstar employee's personal home address, and that former employee was and is the "Managing Director" of White Peaks Capital LLC.  Another former Northstar employee signed the purchase agreement between White Peaks Capital LLC and the seller of the White Peaks site (41992 John Mosby Highway LLC), and likewise signed the purchase agreement between NOVA WPC, LLC and Plaintiffs' affiliate.

PLAINTIFFS' VERIFIED COMPLAINT

208.   White Peaks Capital LLC and NOVA WPC LLC were devices or sham entities used to disguise wrongs, obscure fraud, and/or conceal other unlawful activities in connection with the Count II Defendants' sale of the White Peaks site to Plaintiffs for at least a $17 million premium that the Count II Defendants procured based on false premises.

209.   With respect to the Lease Transaction Enterprise, Defendant Northstar and its affiliates (including the "Sterling" entities 100% owned and controlled by defendant Brian Watson) served as Watson's *alter ego*, as evidenced by Watson's signatory authority over Northstar and Sterling entity assets, his commingling of personal funds with Northstar and Sterling funds, and his creation, use and control of Northstar and Sterling entities to further the Lease Transaction Enterprise.

## COUNT XI
### *Ex Parte* Temporary Restraining Order and Preliminary Injunction – Fed. R. Civ. P. 64, 65 & Va. Code § 8.01-622

210.   Plaintiffs incorporate all preceding paragraphs by reference.

211.   All Defendants were engaged in commerce through their business dealings.

212.   Defendants committed civil RICO violations, fraud, tortious interference, civil conspiracy, breach of contract, reformation, unjust enrichment, and conversion, when, in the course of commerce, Defendants paid, received, or accepted money as part of the kickback scheme and/or other unlawful activities committed by or through the Defendants, the Lease Transaction Enterprise, and/or the Direct Purchase Enterprise.

213.   Plaintiffs were not aware of Defendants' unlawful activities or the Lease Transaction Enterprise or Direct Purchase Enterprise.

214.   Federal Rule of Civil Procedure 65 addresses the authority of a district court to issue "injunctions and restraining orders," and Rule 65(b) states that a district court "may issue a temporary restraining order without written or oral notice to the adverse party or its attorney"

where: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

215.    Federal Rule of Civil Procedure 64 complements Rule 65 in stating that, at "the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64. The rule goes on to state that the "remedies available under this rule include," among other things, "attachment, garnishment, replevin, sequestration and other corresponding or equivalent remedies," and that such remedies are available "however designated and regardless of whether state procedure requires an independent action." *Id.*

216.    Virginia law permits a court to award an injunction "whether the party against whose proceedings the injunction be asked resides in or out of" the jurisdiction where the injunction is sought, Va. Code § 8.01-620, and also "to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property." Va. Code § 8.01-622.

217.    Virginia law further and expressly permits pretrial attachment if the plaintiff sufficiently shows that the defendant "[i]s converting, is about to convert or has converted his property of whatever kind, or some part thereof, into money, securities or evidences of debt with intent to hinder, delay, or defraud his creditors." Va. Code § 8.01-534(A)(4).

218.    Virginia law also states that "[i]t shall be sufficient ground for an action for pretrial levy or seizure or an attachment if the specific personal property sought to be levied or seized" "[w]ill be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an

obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same." Va. Code § 8.01-534(B)(1).

219.    Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief enjoining Defendants and their affiliates, agents, and assigns from: (1) disrupting any direct or indirect business or other relationships or vendor performance at or associated with Plaintiffs' Virginia Lease Transaction and White Peaks properties; (2) taking possession of and disbursing or otherwise dissipating or converting the forthcoming equity payout that IPI intends to make to Defendants Sterling NCP FF LLC and Manassas NCP FF LLC; and (3) spoliating, dissipating, converting, misappropriating or depleting any evidence or assets related to the conduct at issue in this suit, including the specific funds and accounts identified in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

220.    Issue an *ex parte* temporary restraining order enjoining Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and as well as all persons and entities in active concert or participation with them, from:

  i.    disrupting any direct or indirect business operations or relationships at Plaintiffs' Virginia Lease Transaction or White Peaks sites; and

  ii.   spoliating, concealing, wasting, transferring, or otherwise disposing documents, records, communications, files or other evidence or assets used in, or obtained from, the unlawful activities alleged herein, including but not limited to the specific assets identified in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

221.    Enter preliminary and permanent injunctive relief against Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and as well as all persons and entities in active concert or participation with them:

    i.    enjoining any interference with Plaintiffs' ongoing transactions or relationships at the Virginia Lease Transaction or White Peaks sites or elsewhere;

    ii.    enjoining any and all of the activity alleged herein, any acts causing any of the injury complained of, and any acts assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activity complained of herein or from causing any of the injury complained of herein; and

    iii.    enjoining Defendants from using or controlling or in any way disposing, transferring, concealing, wasting or spoliating any evidence, assets, or instrumentalities of the Lease Transaction and Direct Purchase Enterprises as well as any other unlawful activity alleged or addressed herein, including the specific assets listed in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

222. Impose a constructive trust on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein, including the preliminary placement in escrow of the specific assets identified in the Declaration and Application accompanying this complaint. *See* Exs. 7, 20, 38–40; MacDonald Decl. ¶¶ 48–52.

223. Enter judgment on all counts herein in favor of Amazon and against the Defendants.

224. Declare that Defendants' conduct has been willful and that Defendants have acted with fraud, malice and oppression.

225. Enter judgment awarding Amazon actual damages from Defendants of at least the amounts identified in Plaintiffs' Application, and further damages adequate to compensate Amazon for injuries sustained as a cause of Defendants' unlawful activities as alleged herein, including but not limited to interest and costs, in an amount to be proven at trial.

226. Enter judgment disgorging Defendants' profits and other ill-gotten gains.

227. Enter judgment awarding statutory treble damages as well as other enhanced, exemplary, and/or special damages, in amounts to be proven at trial.

228. Enter judgment awarding all reasonable attorneys' fees and costs.

229. Grant Amazon any and all other relief that the Court deems just and proper.

                                           PLAINTIFFS' VERIFIED COMPLAINT

Dated:  April 27, 2020          Respectfully submitted,

*TfAndrews*
_____

Elizabeth P. Papez (*pro hac vice* application pending)
Patrick F. Stokes (*pro hac vice* application pending)
Travis S. Andrews (Va. State Bar No. 90520)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
epapez@gibsondunn.com
pstokes@gibsondunn.com
tandrews@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data
Services, Inc.*

## VERIFICATION OF COMPLAINT

I, Travis S. Andrews, hereby verify, under penalty of perjury, as follows:

1. I am over the age of 18 years.  I am an attorney licensed to practice law in the
   Commonwealth of Virginia and in the District of Columbia.  I am an attorney at the
   law firm of Gibson, Dunn & Crutcher, LLP, and counsel of record for Amazon.

2. I have personal knowledge of the facts set forth in this Verified Complaint, and if called
   upon to do so, I could and would competently testify thereto.

3. I verify under penalty of perjury that the foregoing is true and correct to the best of my
   knowledge, information, and belief.


Dated:  April 27, 2020

_Travis S. Andrews_
Travis S. Andrews